UNITED STATES of America, Appellee,

v.

**Ronald J. PITOCCHELLI,**
Defendant, Appellant.

No. 87–1214.

United States Court of Appeals,
First Circuit.

Heard July 29, 1987.

Decided Oct. 5, 1987.

Ellen Y. Suni with whom Jack I. Zalkind, Boston, was on brief, for defendant, appellant.

Louis M. Fischer, Dept. of Justice, Washington, D.C., with whom Frank L. McNamara, Jr., U.S. Atty., and Ralph D. Gants, Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, NOONAN * and SELYA, Circuit Judges.

NOONAN, Circuit Judge:

Ronald J. Pitocchelli appeals his conviction of conspiracy to commit arson and mail and wire fraud, 18 U.S.C. §§ 371, 844(i), 1341 and 1343; of damaging by fire a building used in interstate commerce, 18 U.S.C. § 844(i)(1) and (2); of mail fraud, 18 U.S.C. §§ 1341 and 1342; and of arson to commit mail fraud, 18 U.S.C. § 844(h)(1) and (2). He challenges the sufficiency of the evidence against him; the limitation on the cross-examination of a government witness; and the instructions given the jury. We affirm the conviction.

## THE CASE AGAINST THE DEFENDANT

Pitocchelli owned a restaurant known as Butterfield's and a night club known as Barnaby's in Methuen, Massachusetts. Barnaby's had been unsuccessful, and Pitocchelli had leased it to a tenant who left precipitously without notice on Saturday, November 24, 1984. Without the rent Pitocchelli was unable to carry the property, and he had ongoing debt of at least $2,367 per month. On November 26 he approached Thomas J. Battye, a friend, and John M. Kelleher, a drinking buddy of Battye, and offered to pay them $3,000 if they would burn Barnaby's. On November 27 Pitocchelli went to Portsmouth, New Hampshire and bought turpentine. While there he called Battye three times to reassure himself that Battye and Kelleher were ready to carry out the job. On his return, he delivered two plastic containers of paint thinner and two cans of turpentine to Battye's trailer. He also gave a key to Barnaby's to Kelleher and assured Kelleher that the alarm would be taken care of.

On the evening of November 28 Kelleher went to Barnaby's carrying the turpentine. All the windows were locked or barred. He used the key he had been given and entered, poured the contents of the cans in the building, lit a match, and departed, leaving the two turpentine cans on the scene.

Pitocchelli was angry that the cans had been left and with Battye went to a paint store looking for the same brand of turpentine to see if the cans carried serial numbers. On the same day, Pitocchelli was questioned by a Methuen police detective as to whether he owed money to anyone. He denied that he did. He was informed that the fire was suspicious but did not venture any speculation as to who might have set it. At the beginning of January 1985 he hired insurance adjusters to represent him in his claim for the fire loss; the adjusters submitted estimates of damages of $74,000 to Pitocchelli's insurer.

In March 1985 Battye and Kelleher were subpoenaed by a federal grand jury. They met with Pitocchelli and all three agreed that they would maintain the story that they knew nothing about the fire. Pitocchelli agreed to give money to Kelleher for a lawyer. Pitocchelli and Kelleher agreed they would stage a fight so that Pitocchelli could banish Kelleher from Butterfield's and be his apparent enemy. Both Battye and Kelleher lied to the grand jury about the fire and their part in it. When Pitocchelli was interviewed by investigators he twice denied that he had keys to Barnaby's and again denied that he owed money.

In December 1985 Battye was convicted of tax evasion. Given use immunity, he was ordered to testify before a grand jury. He then testified to his own part in the burning of Barnaby's and Pitocchelli's part. When Pitocchelli heard of his testimony, he rebuked Battye, asking, "What about my family?" In August 1986 Kelleher made a plea bargain with the government, admitting his part in the crimes and again implicating Pitocchelli.

At the trial of Pitocchelli that followed, Battye and Kelleher were the principal wit-

* Of the Ninth Circuit, sitting by designation.

nesses against him. If one eliminates their testimony, the evidence consisted in the following: Pitocchelli twice lied about owing money when in fact he was obliged to make monthly payments of $2,367 for land adjoining Butterfield's; and he twice lied about not having a key to Barnaby's, when independent evidence showed that he did. The telephone calls on November 27 from Portsmouth put him in the vicinity of the New Hampshire store from which the turpentine cans, found on the scene of the crime in Methuen, came. Finally, he stood to profit by the arson. These circumstances, while undoubtedly suspicious and capable of confirming more robust evidence, did not in themselves amount to proof of Pitocchelli's guilt beyond a reasonable doubt. To convict, the jury had to believe Battye and Kelleher. If they were believed, the evidence against Pitocchelli was overwhelming. We turn now to Pitocchelli's challenges to the two chief government witnesses.

### THE CREDIBILITY OF BATTYE AND KELLEHER

■ The trial judge was asked to rule on the admission under Fed.R.Evid. 801(d)(2)(E) of co-conspirators' out-of-court statements and so had to make a ruling on whether a conspiracy existed. He refused to find a conspiracy and stated his personal belief that neither Battye nor Kelleher were to be believed.. Pitocchelli presses the point that if the trial judge could not believe them the jury should not have believed them either.

Pitocchelli's point has plausibility. Should a man be sent to prison on testimony of witnesses that the judge thinks cannot be trusted? Our system, however, makes a sharp distinction between functions. The judge performed his function in ruling on the admissibility of the statements in relation to an alleged conspiracy. He exercised the discretion conferred on him by Fed.R.Evid. 801(d)(2)(E). He left to the jury the ultimate decision as to whether it believed Battye and Kelleher. The jurors were the triers of fact. The judge was not a thirteenth juror, much less was he a super-juror whose views of credibility could

override the jury's verdict. The same judge who found Battye and Kelleher incredible also denied Pitocchelli's motion for a new trial. Doing so, he respected the autonomy of the jury in the field in which the jury alone can speak. We cannot on appeal second guess the judge's refusal of a new trial and the jury's willingness to accept the essentials of Battye's and Kelleher's account of the events. *United States v. Rothrock,* 806 F.2d 318, 322 (1st Cir. 1986).

### THE LIMITATION ON EVIDENCE OF KELLEHER'S OTHER BAD ACTS

■ Pitocchelli persists, objecting that he was denied the opportunity to present evidence of the violent and vengeful conduct of Kelleher. Specifically, Pitocchelli wanted to call Dino Theodore to testify to a vengeful act by Kelleher against him, and Pitocchelli sought to cross-examine Kelleher about this act and another act of retaliation by Kelleher against the Sergeant's Club. The defendant's theory was that Kelleher had burned Barnaby's not at Pitocchelli's instigation but in hostility and revenge and that proof of other violent and vengeful acts by Kelleher would make this theory more plausible.

The defendant's theory of the case was merely that—a theory, unsupported by direct evidence. The jury was, however, presented with evidence that Kelleher was capable of violent acts and had motives for hostility against Pitocchelli. To the extent that evidence of this kind would shake confidence in Kelleher's credibility or exculpate Pitocchelli entirely by making Kelleher the principal in the arson, the jury had such evidence to consider. On cross-examination, Kelleher admitted that when he was unhappy with Pitocchelli "something" often "happened" at Butterfield's. He admitted that he had driven a car into a fence at Butterfield's out of anger against its owner. He admitted that he had thrown a pumpkin through the restaurant window. Battye testified that Kelleher had twice set fire to Battye's trailer, that it was common for Kelleher to be thrown out of Butterfield's, that employees at Butterfield's were afraid of him, and that Kelleher had threatened to harm Pitocchelli and his wife,

Marie. Both Battye and Kelleher testified that Kelleher had made a sexual proposition to Pitocchelli's wife and had been rejected in the same month the fire occurred. Two employees of Butterfield's described an angry exchange between Kelleher and Marie Pitocchelli at this time. One of them added that on that night Kelleher threatened to "get" Pitocchelli himself. Another employee told of Kelleher's threats to "rip apart" bartenders and waitresses if they did not serve him. Another employee testified that he was told by Kelleher that he would not think anything of cutting Pitocchelli's throat. In short, abundant evidence was presented as to Kelleher's violent disposition, his ambivalent and even hostile attitude toward Pitocchelli, the reasons that might have prompted him to try to revenge himself by framing Pitocchelli, and the reasons Pitocchelli had to fear him. Cross-examination on the two incidents the defendant sought to bring in would have led far afield from the main issues of the trial and would have only confirmed what the jury already knew about Kelleher. The judge acted well within his discretion in excluding the evidence.

■ On appeal, Pitocchelli contends that the limitations on Kelleher's cross-examination offended Amendment VI of the Constitution, requiring that an accused "be confronted with the witnesses against him." Not every limitation on cross-examination can so easily be converted into a constitutional case. The jury was amply informed on Kelleher. The court had no reason to permit "unending excursions into each and every matter touching upon veracity." *United States' v. Kepreos,* 759 F.2d 961, 965 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985); nor was there need to permit peripheral evidence on Kelleher's motives and conduct.

### THE JURY INSTRUCTIONS

The court did not instruct the jury on the weight to be accorded the testimony of an accomplice or the testimony of an admitted perjurer. Defendant's counsel told the court he was content with the charge. On appeal, Pitocchelli argues that the failure to give special instruction on these two points was plain error, requiring reversal.

■ The usual rule is that the jury instructions must be considered as a whole. The court properly instructed the jury on how it should evaluate a witness' credibility, and gave instructions on the caution with which the jury must view the testimony of a witness who had entered into a plea bargain or that of a witness who had immunity. The basic instruction was given that the jurors were the sole judges of the facts. It was not plain error not to give the instructions now belatedly suggested. *United States v. Martin,* 815 F.2d 818 (1st Cir.1987); *United States v. Capone,* 683 F.2d 582, 588 (1st Cir.1982); *United States v. Hickey,* 596 F.2d 1082, 1091 (1st Cir. 1979). Adequately instructed, the jurors fulfilled their function of judges of the facts.

Pitocchelli's conviction must be AF-FIRMED.